# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM S32509**

**Misc. Dkt. No. 2018–09**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Andrew S. CALLOWAY**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Review of Petition for New Trial Pursuant to Article 73, UCMJ

Decided 11 October 2019

————————————

*Military Judge:* John C. Degnan.

*Approved sentence:* Bad-conduct discharge, confinement for 30 days, reduction to E-2, and a reprimand. Sentence adjudged 6 September 2017 by SpCM convened at Holloman Air Force Base, New Mexico.

*For Appellant:* Major Jarett F. Merk, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Dayle P. Percle, USAF; Captain Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before MAYBERRY, J. JOHNSON, and KEY, *Appellate Military Judges*.

Senior Judge J. JOHNSON delivered the opinion of the court, in which Chief Judge MAYBERRY and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

J. JOHNSON, Senior Judge:

A special court-martial composed of a military judge alone convicted Appellant, in accordance with his pleas, of one specification of wrongful use of cocaine on divers occasions and one specification of wrongful use of 3,4-methylenedioxymethamphetamine (MDMA) in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a.[1] The military judge sentenced Appellant to a bad-conduct discharge, confinement for 30 days, hard labor without confinement for 30 days, reduction to the grade of E-2, and a reprimand. The convening authority approved the sentence with the exception of hard labor without confinement.

Appellant raises five issues on appeal: (1) whether Appellant received ineffective assistance of counsel; (2) whether Appellant's guilty pleas were "involuntary;" (3) whether the military judge had the authority to grant Appellant's motion for a new trial at a post-trial session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a), directed by the convening authority after the military judge had authenticated the record;[2] (4) whether the military judge compromised his impartiality through his questioning of a prosecution witness; and (5) whether Appellant is entitled to a new trial pursuant to Article 73, UCMJ, 10 U.S.C. § 873, based on newly-discovered evidence.[3] In addition, we address whether Appellant is entitled to relief due to facially unreasonable post-trial delay. We find Appellant did receive ineffective assistance of counsel; accordingly, we modify the findings, set aside the sentence, and authorize a rehearing as to the sentence only.

## I. BACKGROUND

To explain the issues before us on appeal, it is necessary to review the procedural history of Appellant's case in some detail.

---

[1] All references in this opinion to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] In *United States v. Anderson*, No. ACM 39023, 2017 CCA LEXIS 383, at *9–14 (A.F. Ct. Crim. App. 31 May 2017) (unpub. op.), *rev. denied*, 76 M.J. 461 (C.A.A.F. 2017), this court answered this question contrary to Appellant's position. We continue to adhere to our reasoning in *Anderson*, and we find this issue does not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

[3] Appellant's petition for a new trial pursuant to Article 73, UCMJ, 10 U.S.C. § 873, was filed and docketed separately with this court. His brief in support of that petition is included with his brief addressing the other issues he raises pursuant to Article 66, UCMJ, 10 U.S.C. § 866, and we address both the petition and appeal in this opinion.

**A. Trial**

In February 2017, Appellant was stationed at Holloman Air Force Base (AFB), New Mexico. On 18 February 2017, Appellant's unit conducted a urinalysis inspection, also known as a "unit sweep." Appellant provided a urine sample which was tested by the Air Force Drug Testing Laboratory (AFDTL). On 7 March 2017, the AFDTL reported that Appellant's sample tested positive for cocaine and MDMA. As a result of this positive test, on 9 March 2017 Appellant was ordered to provide another urine sample. Appellant's second sample was also tested by the AFDTL, which on 22 March 2017 reported a positive result for cocaine.

On 15 June 2017, Appellant's squadron commander preferred one charge and two specifications alleging violation of Article 112a, UCMJ, specifically wrongful use of cocaine on divers occasions and wrongful use of MDMA. The convening authority referred the charge and specifications to a special court-martial on 26 June 2017. On 4 August 2017, Appellant's trial defense counsel, Major (Maj) JB,[4] submitted to the Government a written request for discovery including, *inter alia*:

> e. Any books, papers, documents, photographs, tangible objects, buildings, or places, or copies of [sic] portions thereof, which are within the possession, custody, or control of military authorities and are material to the preparation of the Defense . . . . R.C.M. [Rule for Courts-Martial] 701(a)(2)(A).
>
> . . . .
>
> n. Any evidence in the Government's possession, including trial counsel or any military authorities, that may reasonably tend to:
>
>> i. Negate the Accused's guilt;
>>
>> ii. Mitigate the degree of the charged offense(s); or
>>
>> iii. Reduce the Accused's punishment. R.C.M. 701(a)(6) . . . .
>
> o. Any evidence in the Government's possession favorable to the Accused. R.C.M. 701(a)(6).
>
> . . . .
>
> kk. Any *Bickel* policy[5] or other policy on Holloman AFB requiring or permitting the repeated urinalysis testing of Airmen who initially test positive for drugs on a urinalysis test.

---

[4] Maj JB was a captain at the time of Appellant's trial.

[5] *See United States v. Bickel*, 30 M.J. 277 (C.M.A. 1990).

ll. Any documentation related to unit sweeps for urinalysis tests
resulting in positive or negative findings in this case.

(Footnote added).

On 11 August 2017, trial counsel, Captain (Capt) SM, advised Maj JB by email that he was working to complete the response to the Defense's discovery request, which might be delayed due to low manning at the Holloman AFB legal office. On 24 August 2017, Capt SM emailed Maj JB the location of the Government's electronic "discovery folder." Also on 24 August 2017, the Defense submitted an offer for a pretrial agreement (PTA). In exchange for a three-month limitation on confinement, Appellant offered to, *inter alia*, plead guilty to the Charge and Specifications, to enter into a reasonable stipulation of fact with the Government, and to elect trial by a military judge alone. The staff judge advocate (SJA) recommended approval, and the convening authority accepted the PTA offer on 31 August 2017.

At the court-martial convened on 6 September 2017, in accordance with the PTA, Appellant elected trial by military judge alone and pleaded guilty. The military judge conducted an inquiry into the stipulation of fact and the providency of Appellant's pleas.[6] Both the providency inquiry and the stipulation informed the military judge that due to Appellant's consumption of alcohol on the night in question, Appellant could not recall using MDMA; however, Appellant believed he did use it based on the first urinalysis result and information provided by a friend of Appellant's who was present at the time. Appellant did recall and describe using cocaine on two occasions corresponding to the two positive urinalysis results. After some initial hesitation, the military judge accepted Appellant's pleas and found Appellant guilty of the Charge and Specifications accordingly.

**B. Post-Trial**

Unbeknownst to trial counsel or to the Defense, on 28 August 2017—nine days before the trial—the AFDTL decertified Dr. DT, the laboratory certifying official (LCO) who had certified the results of both of Appellant's urinalyses, from the tasks of reviewing and certifying drug testing reports (DTRs). The AFDTL took this action due to "[i]mproper/incorrect assembly of drug testing reports." The AFDTL identified errors with respect to the preparation of both of Appellant's DTRs. On 15 September 2017, a different AFDTL LCO recertified the result of Appellant's first urinalysis as correct. The AFDTL determined the second urinalysis did not require recertification because the error was merely administrative and related to the order of the pages in the DTR.

---

[6] *See United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969).

Dr. DT's errors in both of Appellant's DTRs related to the assembly of the reports; neither error implicated the scientific accuracy of the test results.

In late September 2017, after Appellant's trial, the legal advisor to the AFDTL informed trial counsel, Capt SM, of Dr. DT's decertification. On 4 October 2017, Capt SM notified Maj JB, Appellant's trial defense counsel, of the decertification and provided Maj JB the decertification letter. At trial defense counsel's request, on 20 November 2017 the convening authority directed a post-trial Article 39(a), UCMJ, session be held "to address the late disclosure by the Government of the decertification" of Dr. DT. On 8 December 2017, the Defense submitted to the military judge a motion for a new trial on the basis that the Government's failure to disclose the decertification affected Appellant's decision to plead guilty. The Government opposed the motion.

The Article 39(a) hearing convened on 19 December 2017. The Government called as a witness Dr. RH, the deputy director of the AFDTL, to testify regarding the circumstances of Dr. DT's decertification as a LCO. The military judge then heard argument from the parties on the Defense's motion for a new trial. The military judge denied the motion in a written ruling dated 5 February 2018. The military judge found that under R.C.M. 1102 he lacked the authority to grant a new trial after he authenticated the record on 25 September 2017. Assuming *arguendo* he did have such authority, the military judge further found the late disclosure of the LCO decertification, although a discovery violation, was not "material" because the LCO's errors were merely administrative and did not impugn the scientific validity of the testing of Appellant's urine samples. Accordingly, the military judge concluded "the Defense has not shown that there is a reasonable probability that had the evidence been disclosed, the result of th[e] proceeding would have been different; nor is the likelihood of a different result . . . great enough to undermine[ ] the confidence in the outcome of [Appellant]'s trial."

Appellant's final clemency submission included a memorandum from trial defense counsel dated 1 March 2018. Therein Maj JB referred once again to the Government's failure to disclose the LCO decertification before trial. In addition, Maj JB raised for the first time a separate discovery issue:

> The Government also failed to turn over the Urinalysis Reinspection policy in place at Holloman AFB. The Urinalysis Reinspection policy states how and when Airmen can be tested after receiving positive drug test results. This policy indicated it was only in place for the Random Urinalysis Inspection Program. [Appellant]'s first positive test, however, was from a unit sweep and not from a random test. His second positive urinalysis would

> therefore likely not have been admissible against him. [Appellant] was allowed to plead guilty without any of this exculpatory information being turned over to him.
>
> . . . Because of this, we would be seeking an order for a new trial from you . . . .

However, Maj JB acknowledged that the remedies available from the convening authority under Article 60, UCMJ, 10 U.S.C. § 860, were limited. Because the convening authority was not authorized to grant a new trial or disapprove the bad-conduct discharge, the Defense requested disapproval of Appellant's reduction to the grade of E-2 and 30 days of hard labor without confinement.

In the third and final addendum to the staff judge advocate's recommendation (SJAR) to the convening authority, dated 12 March 2018, the acting SJA found the Defense's allegation of error with respect to the LCO decertification without merit in light of the military judge's ruling on the post-trial Article 39(a) proceedings. However, with respect to the Holloman AFB Urinalysis Reinspection policy, she stated:

> The policy in place at the time of [Appellant]'s tests states it was only in place for the Random Urinalysis Inspection Program. However, [Appellant]'s first positive test was from a unit sweep, not from a random test. Therefore, the second positive urinalysis would likely not have been admissible against him, and additional evidence would have been needed to prove the divers use of cocaine. Without this additional evidence, [Appellant] would not have been found guilty of divers use of cocaine. I considered carefully this allegation of error and find it may have some merit.
>
> . . . Under R.C.M. 1107(c), because the adjudged sentence includes a bad conduct discharge, as the convening authority, you are not authorized to dismiss a charge or specification by setting aside a finding of guilty thereto, nor can you change a finding of guilty to a charge or specification to a finding of guilty to an offense that is a lesser included offense of the offense stated in the charge or specification. Additionally, under R.C.M. 1107(e)(1), as the convening authority, you are not authorized to order a rehearing since the adjudged sentence for this case includes a bad-conduct discharge. These options are only available to the Air Force Court of Criminal Appeal[s] or higher appellate authorities. Since these options are not available to you, I recommend that you approve only so much of the sentence as provides for a

> reprimand, reduction to the grade of E-2, confinement for 30 days, and a bad conduct discharge.

On 14 March 2018, in accordance with the acting SJA's recommendation, the convening authority disapproved the adjudged 30 days of hard labor without confinement and approved the balance of Appellant's sentence.

## C. *DuBay* Hearing

Appellant's case was initially docketed with this court on 28 March 2018. Appellant filed his initial assignments of error on 24 October 2018, and the Government filed its answer on 26 November 2018. Appellant raised, *inter alia*, the issue of whether his guilty pleas were "involuntary" due to discovery violations on the part of the Government.[7] On 12 April 2019, this court ordered a post-trial fact-finding hearing pursuant to *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967) (per curiam).[8] The hearing was held on 30 May 2019 at Holloman AFB, New Mexico, with the original military judge presiding; Appellant was present and represented by his appellate defense counsel. The military judge heard testimony from Maj JB, Appellant's trial defense counsel; the

---

[7] In his initial brief to the court Appellant did not assert that he had received ineffective assistance of counsel.

[8] Our order directed that, "[a]t a minimum, the following questions will be addressed during the hearing:"

> 1. Was the urine sample Appellant was ordered to provide on 9 March 2017 a reinspection collected within the scope of and in accordance with the urinalysis reinspection policy in effect at Holloman AFB at that time?

> 2. Did the Government fail to provide timely disclosure to the Defense of that urinalysis reinspection policy, or any related information, in violation of R.C.M. 701 or any other discovery requirement?

> 3. When and how did trial defense counsel receive or otherwise become aware of the urinalysis reinspection policy, either by disclosure by the Government in relation to Appellant's court-martial or by any other means?

> 4. Does the Government's failure, if any, to disclose the urinalysis reinspection policy, or any related information, in compliance with R.C.M. 701 or any other discovery requirement raise a substantial basis in law or fact to question the providency of Appellant's guilty pleas?

In addition, our order authorized the military judge to "address any other matters that may arise during the fact-finding hearing that he or she finds to be pertinent to the issues in question."

two trial counsel at Appellant's trial; the chief of military justice for the Holloman AFB legal office; and the deputy SJA for the Holloman AFB legal office, who signed the final SJAR addendum as the acting SJA. The military judge also received a number of exhibits and heard argument from counsel for both sides.

After the *DuBay* hearing, on 2 July 2019 the military judge made a number of written findings of fact. *Inter alia*, the military judge made the following findings which we find to be supported by the record:

- The urine sample Appellant was ordered to provide on 9 March 2017 was not collected within the scope of the base urinalysis reinspection policy in effect at the time, dated 5 October 2016. The "policy concerned exclusively random urinalysis inspections and follow-up inspections for the presence of illegal drugs," and not commander-directed unit inspections.
- The Government failed to provide timely disclosure in pretrial discovery of the urinalysis reinspection policy. In fact, in spite of the Defense's specific discovery request, the Government "never provided the urinalysis reinspection policy to Maj [JB]."[9] However, Maj JB did not follow up before trial on the Government's failure to provide this document, nor did he independently contact the base Drug Demand Reduction Program to obtain a copy of the policy.

At some point shortly before the December 2017 post-trial Article 39(a) hearing regarding the LCO decertification discovery issue, Maj JB learned from the local area defense counsel (ADC) at Holloman AFB that "there might be a problem" with the base's reinspection policy. Shortly after the Article 39(a) hearing, Maj JB read an email from the local ADC that contained a base *Bickel* policy dated 27 August 2015 which—like the 5 October 2016 policy actually in effect on 9 March 2017—indicated the policy applied to "random" urinalysis tests, and not to commander-directed unit inspections.

**D. Trial Defense Counsel Declaration**

On 6 August 2019, Appellant filed a supplemental assignment of error wherein, *inter alia*, he for the first time asserted Maj JB had provided him ineffective assistance of counsel at trial by advising him "to plead guilty without reviewing the *Bickel* Policy and verifying the admissibility of the drug testing reports." At the Government's request, this court ordered an affidavit from Maj JB. Accordingly, on 25 August 2019, Maj JB submitted a declaration addressing Appellant's ineffective assistance claim.

---

[9] Maj JB saw the applicable 5 October 2016 policy memorandum for the first time on 29 May 2019, the day before the *DuBay* hearing, when Appellant's appellate defense counsel showed it to him.

*Inter alia*, Maj JB explained that his strategy was initially shaped by his belief that, in addition to the two positive urinalysis results, at least two witnesses had provided statements to investigators that they had seen Appellant use "illegal drugs during or near the charged timeframe." In addition, Maj JB stated:

> I believed suppressing the first positive test would almost assuredly lead to the suppression of the second. I put significant effort into finding problems with the first test, which was conducted pursuant to a unit sweep. I discussed this with [Appellant]. I researched the issue and interviewed witnesses. I ultimately determined the facts did not support a suppression motion of the unit sweep urinalysis.

However, as trial drew nearer, it became apparent to Maj JB the Government did not intend to call any eyewitnesses to Appellant's drug use.

Maj JB does "not believe [he] ever saw the actual *Bickel* policy in place before trial." However, he "believe[d] or assume[d] there was a [*Bickel*] policy in place at the time of [Appellant]'s urinalysis tests and there were insufficient grounds to challenge the policy . . . ." Maj JB was "not fully confident why [he] believed that, but [he] would not have actively decided [he] did not need to see the *Bickel* policy." When, after the post-trial Article 39(a) hearing, Maj JB saw the 27 August 2015 version of the policy for the first time, he was "extremely alarmed" because it was "so apparent" the policy applied only to random urinalysis testing. Maj JB checked his files but could find no evidence he ever received the policy.

Maj JB continued:

> After seeing the 2016 *Bickel* policy [applicable to Appellant's urinalyses], I believe I would have advised [Appellant] differently regarding pleading guilty on 6 September 2017 if I had seen it before trial. The decisions to plead guilty or not and to continue with the [PTA] or not were very close decisions in this case, once it became apparent the eye witnesses would not be testifying. Having the 2016 *Bickel* policy would have certainly pushed the recommendation toward leaving the PTA and not pleading guilty. Based on my experience in other cases, my recommendation would likely have been to file a motion to suppress the urinalysis obtained pursuant to the *Bickel* policy and then reassess pleading guilty or not after the results of that motion. At the very least, it would have changed our bargaining position, more than likely leading to not accepting and/or following through with the

> PTA signed in this case. The *Bickel* policy combined with the derogatory information from the [AFDTL] regarding Dr. [DT] . . . would have pushed the recommendation even farther away from pleading guilty and accepting or following through with the PTA in this case.

## II. DISCUSSION

### A. Ineffective Assistance of Counsel

#### 1. Law

The Sixth Amendment[10] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). Accordingly, we "will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza*, 67 M.J. at 474).

To establish ineffective assistance of counsel, "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361–62 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687; *Mazza*, 67 M.J. at 474). "In order to show prejudice under *Strickland*, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Green*, 68 M.J. at 362 (alteration in original) (quoting *Strickland*, 466 U.S. at 694) (additional citation omitted).

"[E]ntry of a guilty plea is a critical stage of the litigation, where a criminal defendant is entitled to effective assistance of counsel." *United States v. Rose*, 71 M.J. 138, 143 (C.A.A.F. 2012) (citations omitted). "In the context of a guilty plea, the prejudice question is whether 'there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and

---

[10] U.S. CONST. amend. VI.

would have insisted on going to trial.'" *Id*. at 144. (alteration in original) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)) (additional citation omitted).

### 2. Analysis

Appellant alleges Maj JB provided him ineffective assistance by (1) failing to discover Dr. DT's decertification prior to trial by calling the AFDTL himself; and (2) failing to review the 5 October 2016 *Bickel* policy and thereby discovering the inadmissibility of the second positive urinalysis result. We address each allegation separately.

#### a. LCO Decertification

We are not persuaded Appellant has demonstrated that Maj JB's failure to personally contact the AFDTL and discover Dr. DT's 28 August 2017 decertification in the few days before Appellant's 6 September 2017 trial date fell "measurably below" the performance expected of fallible lawyers. *See United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991) (citation omitted). The Government had a duty to provide such information to the Defense under its existing discovery obligations. Maj JB's declaration describes what information trial counsel "normally" provided and what steps he independently "regularly" took in drug cases to identify potential derogatory data regarding the AFDTL. Although Maj JB does not specifically assert what actions he took in this regard in Appellant's case, under the circumstances of this case, we are not persuaded Appellant has overcome the "strong presumption" that Maj JB's performance was "within the wide range of reasonable professional assistance" in this regard. *See Strickland*, 466 U.S. at 689 (citation omitted). Moreover, the military judge's ruling on Appellant's post-trial motion for a new trial found that the nondisclosure of Dr. DT's decertification was not "material" because, *inter alia*: (1) Dr. DT was decertified only with respect to assembly, review, and certification of drug testing reports (DTRs), and not for other tasks such as screening and data review; (2) all Dr. DT's errors identified in DTRs were administrative in nature, including pages missing or out of order; (3) the review "did not disclose any tests that were compromised, adulterated in any way, or tests results that were invalid due to Dr. [DT]'s administrative errors;" (4) Dr. DT was the LCO for both Appellant's urinalysis DTRs, but he did not handle or test the urine samples, and, as in the other cases, his errors related to the assembly of the DTRs rather than the validity of the underlying tests. In short, Dr. DT's decertification did not specifically impugn the scientific validity of Appellant's test results. Therefore, we do not find a "reasonable probability" that Appellant would have changed his plea on this basis. *See Green*, 68 M.J. at 362 (citations omitted).

#### b. Bickel *Policy*

Maj JB's failure to review the 5 October 2016 *Bickel* policy is a different matter. In a prosecution based in part on a positive urinalysis test purportedly obtained as a reinspection pursuant to *Bickel*, particularly one where the accused considered pleading not guilty, trial defense counsel's failure to review the applicable policy purporting to authorize the reinspection is "measurably below" competent performance. *See Polk*, 32 M.J. at 153 (citation omitted). As Maj JB concedes, this was not a reasonable tactical or strategic decision on his part to which we owe deference. It was simply an error. Nor is it sufficient excuse that the Government failed to provide the policy in response to the Defense's specific discovery request—although that was an error on the Government's part. Trial defense counsel had a responsibility to monitor the Government's discovery responses and to pursue the information he required to competently prepare for Appellant's trial.

In addition to deficient performance, we find prejudice. As the military judge found and as the Government concedes, the urine sample Appellant was ordered to provide on 9 March 2017 was collected outside the scope of the applicable 5 October 2016 reinspection policy. Therefore, it was not a lawful inspection and was not generally admissible at trial as evidence of Appellant's guilt. *See generally* Mil. R. Evid. 313; *Bickel*, 30 M.J. at 286 ("[T]he testing must be performed on a nondiscriminatory basis pursuant to an established policy or guideline that will eliminate the opportunity for arbitrariness . . . ." (citation omitted)). So far as the record indicates, this inadmissible test was the sole evidence of Appellant's guilt of the second use of cocaine, other than the stipulation of fact and Appellant's own statements during the military judge's guilty plea inquiry which were direct products of the PTA and Appellant's decision to plead guilty.

The Government concedes Maj JB "overlooked his obligation to review the *Bickel* policy letter," but contends Maj JB nevertheless "made a reasonable trial strategic decision to stop discovery and get a plea deal done quickly" in light of other potential witnesses to Appellant's drug use who may have disclosed additional misconduct. The Government argues "Appellant has not met his burden to say why his plea would have changed." We disagree. First, Maj JB did not make a "strategic decision" to fail to review the *Bickel* policy; this was simply an error as he mistakenly believed for some reason that he had determined the second urinalysis test result was admissible. Second, once the discrepancy with the second urinalysis was identified, it became apparent to all parties that the second test was not admissible as evidence of guilt of a second use of cocaine. The Government speculates as to the availability of other potential witnesses to drug abuse by Appellant, but it is entirely unclear from the record who, if anyone, might have testified, or if they did that they would have testified to the second cocaine use for which Appellant was convicted. In order to demonstrate prejudice, Appellant is not required to *prove* what would

have happened had the error not occurred; it is sufficient that he demonstrate a "probability sufficient to undermine confidence in the outcome" of the trial. *Green*, 68 M.J. at 362 (citations omitted). We find a reasonable probability that, had the error not occurred, Appellant would not have pleaded guilty to the "on divers occasions" language in Specification 1 of the Charge. *See Rose*, 71 M.J. at 143.

However, we are not so persuaded with respect to Appellant's guilty pleas to the first use of cocaine and the use of MDMA. Nothing in the record impugns the admissibility or scientific validity of the first positive urinalysis result. We recognize it would presumably have been less difficult for Appellant to defend against one positive urinalysis rather than two. However, Maj JB acknowledges that investigators had received statements from at least two witnesses regarding some illegal drug use by Appellant. We note that according to Appellant this first drug use occurred at a party attended by "20 to 30 people," and Appellant remembers using cocaine with a group of "several" others. Furthermore, despite his memory problems, Appellant knew he had used MDMA because a friend saw him use it and told him about it, indicating Appellant was aware of at least one witness to that offense. In addition, we note Maj JB's declaration does not go so far as to say he would have advised Appellant to plead not guilty to all the allegations. In short, Appellant has not met his burden to demonstrate a reasonable probability that he would have pleaded not guilty to the first use of cocaine and to using MDMA had his counsel reviewed the *Bickel* policy.

Accordingly, we except the words "on divers occasions" from Specification 1 of the Charge, and we substitute the words "prior to the 54th Aircraft Maintenance Squadron's urinalysis inspection on 18 February 2017" therefor. *See United States v. English*, 79 M.J. 116, 120 (C.A.A.F. 2019) ("In performing its review under Article 66(c), UCMJ, a Court of Criminal Appeals (CCA) may narrow the scope of an appellant's conviction to that conduct it deems legally and factually sufficient." (citations omitted)). We set aside and dismiss the excepted words and set aside the sentence.

## B. Providency of Appellant's Guilty Plea

### 1. Law

An "unconditional guilty plea waives all nonjurisdictional defects at earlier stages of the proceedings." *United States v. Hardy*, 77 M.J. 438, 442 (C.A.A.F. 2018) (quoting *United States v. Lee*, 73 M.J. 166, 167 (C.A.A.F. 2014)). The appellant has the burden to demonstrate a substantial basis in law and fact for questioning his guilty plea. *United States v. Finch*, 73 M.J. 144, 148 (C.A.A.F. 2014) (quoting *United States v. Negron*, 60 M.J. 136, 141 (C.A.A.F. 2004)).

### 2. Analysis

Having set aside the "on divers occasions" language in Specification 1, we focus our analysis of the providency of Appellant's pleas of guilty to the remaining charged language, that Appellant used cocaine and MDMA at a party sometime before 18 February 2017. The providency of Appellant's pleas in light of the Government's discovery violations with respect to the decertification of Dr. DT and the 5 October 2016 *Bickel* policy is a legally distinct issue from the prejudice resulting from Maj JB's alleged ineffective assistance regarding these matters, analyzed above. However, for similar reasons, we find these discovery violations, like Maj JB's failure to uncover this information himself, do not generate a substantial basis in law or fact to question the providency of Appellant's pleas to the first cocaine use and to using MDMA.

We agree with the military judge's findings at the post-trial Article 39(a) session and the *DuBay* hearing that the failure to disclose before trial Dr. DT's decertification and the 5 October 2016 *Bickel* policy, respectively, were discovery violations by the Government. *See generally* R.C.M. 701.

However, as described above, we also agree with the military judge's conclusion that the failure to disclose Dr. DT's decertification, although erroneous, was not "material." Neither the decertification itself nor the underlying administrative errors impugned the scientific validity of Appellant's first positive urinalysis result. Accordingly, this nondisclosure does not present a *substantial* basis to question Appellant's plea, particularly given the Defense's awareness of potential corroborating witnesses.

Although more significant, the inadmissibility of the second urinalysis similarly does not present a *substantial* basis to question Appellant's pleas with respect to the first cocaine use and the MDMA use. Again, there was no indication the first urinalysis result was unreliable. In addition, Appellant knew he used cocaine with a group of other people at a party attended by numerous individuals. Moreover, trial defense counsel knew the Government had received statements from witnesses to Appellant's illegal drug use. Although Appellant might have obtained a more favorable PTA, a lesser sentence, or both with the second cocaine use suppressed, we conclude Appellant has not demonstrated a substantial basis to question his guilty plea to the non-divers first use of cocaine and to using MDMA.

## C. Military Judge Impartiality

### 1. Additional Background

At the post-trial Article 39(a) session convened to address the untimely discovery of Dr. DT's decertification, the Government called Dr. RH, the AFDTL deputy director, to testify by telephone. Dr. RH initially provided basic information about her background and position at the AFDTL and stated she had

testified as "an expert" approximately 250 times. Dr. RH then identified herself as the author of a report that found administrative errors in DTRs that ultimately led to an investigation and to Dr. DT's decertification. She explained that some of the DTRs that Dr. DT initially certified that were found to contain errors were recertified by another LCO, but some DTRs were not recertified because "all the data was present" in the reports which were "just out of order." Then, in response to a question by trial counsel, Dr. RH opined that an "independent expert" not employed at AFDTL would be able to review the DTRs that had not been recertified and conclude that "the results were valid," and in fact, such an expert "likely would not recognize that pages were out of order."

At that point, the following colloquy ensued between the military judge, the trial counsel, and the witness:

> MJ [Military Judge]: Thank you, Doctor. Government, before you get into additional opinions from the this [sic] witness, do you want to qualify this witness as an expert witness?
>
> TC (Trial Counsel): Yes, Your Honor. We would offer this witness as an expert witness.
>
> MJ: In what field?
>
> TC: Your Honor, in the field of pharmacology and, sir, as the supervisory official at AFDTL.
>
> MJ: Doctor, what are you typically recognized as an expert in when you're recognized as an expert in court?
>
> WIT [Dr. RH]: Typically, I'm recognized as an expert in pharmacology, toxicology, and forensic urine drug testing.
>
> TC: And, Your Honor, we would like to offer the expert.
>
> MJ: One moment, government.
>
> TC: Yes, Your Honor.

The military judge then asked Dr. RH a series of questions. He established that Dr. RH had worked at AFDTL for over 19 years, including approximately 15 years as the forensic sciences branch chief. In that capacity, she supervised all AFDTL employees in the forensic sciences section, including the LCOs and expert witnesses, and she was responsible for "ensur[ing] that all the data is certified correct and accurate." Dr. RH confirmed that throughout her employment at the AFDTL she had been "involved in forensic urinalysis testing . . . in either supervising or reviewing or certifying laboratory reports." She further testified the AFDTL received approximately 4,000 urine samples for testing each day, and approximately 75,000 to 80,000 samples each month.

Maj JB then objected to Dr. RH testifying as an expert. Maj JB explained the Defense had been provided no notice Dr. RH would be testifying in that capacity, rather than simply as a factual witness regarding Dr. DT's decertification. The military judge clarified there was no objection to Dr. RH's qualifications as an expert in pharmacology, toxicology, and forensic urinalysis testing, and the military judge recognized her as an expert in those fields. In additional colloquy with the military judge, Maj JB indicated he had no objection to Dr. RH testifying as a witness to facts and matters within her knowledge. However, Maj JB believed the Defense would be "hampered" with respect to certain opinion testimony by not having its own expert, which he acknowledged had been waived pursuant to the PTA. Ultimately, the military judge advised Maj JB: ""[I]f you believe you have been hampered in some way by not having an expert, [if] you believe the questioning by the government is going too far [a]field, then just make your objection and we'll have that discussion."

Maj JB did not object during the remainder of the trial counsel's direct examination of Dr. RH, which essentially dealt with explaining the nature of the administrative errors Dr. DT made in compiling Appellant's two DTRs. After a short cross-examination and redirect examination, the military judge asked Dr. RH approximately 55 more questions, going into much greater detail regarding the specific errors in Appellant's two DTRs and Dr. DT's role with regard to Appellant's urinalyses. After a short recross-examination by Maj JB, the military judge asked approximately ten more questions regarding the AFDTL's status as a forensic laboratory, its quality control procedures, and how discrepancies discovered at the AFDTL are communicated to the field.

### 2. Law

An accused has a right to an impartial military judge. *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001) (citations omitted); *see* R.C.M. 902(a), (b). "When an appellant . . . does not raise the issue of disqualification [of a military judge] until appeal, we examine the claim under the plain error standard of review." *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011) (citing *United States v. Jones*, 55 M.J. 317, 320 (C.A.A.F. 2001)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice." *Id.* (citing *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008)).

R.C.M. 902(a) provides, in pertinent part, "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." The test on appeal is "'whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt' by the military judge's actions." *Martinez*, 70 M.J. at 157–58 (quoting *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000)). The military judge's appearance of impartiality is reviewed under an

objective standard of a reasonable person with knowledge of all the circumstances. *Id.* (quoting *United States v. Kincheloe*, 14 M.J. 40, 50 (C.M.A. 1982)) (additional citations omitted).

### 3. Analysis

Appellant contends the military judge "crossed the line of acceptable judicial inquiry and became an advocate for the prosecution." Appellant concedes a military judge is not a "mere figurehead," *United States v. Kimble*, 49 C.M.R. 384, 386 (C.M.A. 1974), and that a military judge is permitted to "interrogate witnesses," Mil. R. Evid. 614(b), and, where sitting as a court-martial, "to obtain evidence in addition to that presented by the parties," R.C.M. 801(c). However, in this case Appellant contends the military judge went too far by asking the necessary questions to qualify Dr. RH as an expert witness, and by eliciting testimony that tended to minimize the significance of Dr. DT's errors and thereby to undermine the Defense's request for a new trial. We are not persuaded.

It is important to consider the context for the military judge's actions; what may be appropriate questioning by a military judge in one setting may be inappropriate in another. First, in this case, there were no court members who might be improperly swayed by an appearance of partiality on the part of the military judge. Second, the questioning occurred at a post-trial Article 39(a) hearing that the convening authority had specifically directed in order for the military judge "to address the late disclosure by the Government of the decertification;" therefore it was not inappropriate for the military judge to ask a witness questions in order to ensure the hearing achieved the directed purpose. The military judge was not required to sit mute in the presence of the witness with the necessary information to answer the inquiry the military judge was directed to undertake. Third, after the Defense's initial objection to opinion testimony, the military judge advised trial defense counsel he could continue to object as necessary if he believed his lack of access to an expert was "hampering" the Defense. Maj JB never objected again. In fact, from that point on Dr. RH's testimony was largely limited to factual matters about AFDTL DTRs, a line of inquiry Maj JB stated he generally had no objection to. Fourth, at no point did Maj JB challenge the military judge's questioning as inappropriate or an abandonment of his impartial role, or object to the military judge's continued participation in the case.

We would be more concerned if the military judge had asked these questions before court members during presentation of evidence for findings or sentencing. However, in this case, we do not find it "plain or obvious" that a reasonable observer with knowledge of all the circumstances would doubt the court-martial's legality, fairness, or impartiality. *See Martinez*, 70 M.J. at 157–58 (citations omitted).

**D. Petition for New Trial**

**1. Law**

A petitioner may petition for a new trial "on the grounds of newly discovered evidence or fraud on the court." Article 73, UCMJ, 10 U.S.C. § 873. A petition for a new trial does not proceed through the usual appellate process. *See id.*; *United States v. Brooks*, 49 M.J. 64, 68 (C.A.A.F. 1998). Instead, it is submitted to The Judge Advocate General, who acts on the petition unless the case is pending before an appellate court, in which case he refers the petition to the appellate court where the case is pending. R.C.M. 1210(a), (e).

"No fraud on the court-martial warrants a new trial unless it had a substantial contributing effect on a finding of guilty or the sentence adjudged." R.C.M. 1210(f)(3). Examples of fraud on a court-martial that may warrant granting a new trial include, *inter alia*, "willful concealment by the prosecution from the defense of evidence favorable to the defense which . . . would probably have resulted in a finding of not guilty . . . ." R.C.M. 1210(f)(3), Discussion.

"[R]equests for a new trial . . . are generally disfavored," and are "granted only if a manifest injustice would result absent a new trial . . . ." *United States v. Hull*, 70 M.J. 145, 152 (C.A.A.F. 2011) (quoting *United States v. Williams*, 37 M.J. 352, 356 (C.M.A. 1993)).

**2. Analysis**

Appellant[11] asserts he is entitled to a new trial under Article 73, UCMJ, on the basis of fraud upon the court because he was "fraudulently induced into pleading guilty based on misrepresented evidence."[12] Specifically, Appellant identifies the Government's failure to disclose before trial both the AFDTL's decertification of Dr. DT and the 5 October 2016 base urinalysis reinspection policy, as described above. Although we do find the Government violated its discovery obligations, as we have addressed, we are not persuaded that Appellant has demonstrated he is entitled to a new trial due to fraud.

First, although we recognize the descriptions of fraud warranting a new trial given in the Discussion of R.C.M. 1210(f)(3) are non-exclusive examples, we do not find "willful concealment" by the Government. With respect to the

---

[11] We recognize that for purposes of the petition for a new trial under Article 73, UCMJ, Appellant is more properly styled "Petitioner." However, for consistency we continue to refer to him as "Appellant" in this section.

[12] Appellant does not contend he is entitled to a new trial on the basis of newly-discovered evidence. *See* R.C.M. 1210(a) ("A petition for a new trial of the facts may not be submitted on the basis of newly discovered evidence when the petitioner was found guilty of the relevant offense pursuant to a guilty plea.").

decertification, trial counsel were simply unaware of Dr. DT's status at the time of Appellant's trial. Once trial counsel became aware after the trial, they notified trial defense counsel, leading to the post-trial Article 39(a) hearing. With respect to the urinalysis reinspection policy, the nondisclosure was an unintentional error. At the *DuBay* hearing, the base legal office's chief of military justice testified the failure to put the *Bickel* policy memorandum in the discovery folder for the Defense was an "oversight." All five of the Holloman AFB legal office personnel who testified at the *DuBay* hearing indicated they were not aware of the discrepancy that the policy did not cover Appellant's second urinalysis until after Appellant's trial. Although neither Article 73 nor R.C.M. 1210 specifically define "fraud on the court," the term "fraud" indicates an intent to deceive which is not borne out in the record before us.[13]

Second, Appellant has not demonstrated a new trial is required to avert "manifest injustice." *See Hull*, 70 M.J. at 152 (citation omitted). Because these two discovery violations were uncovered before Appellant's case was docketed with this court, he has properly raised them in his direct appeal to us under Article 66, UCMJ, 10 U.S.C. § 866. Accordingly, we have addressed the errors in detail above, and we take the warranted corrective action in our decretal paragraph below. Appellant's petition under Article 73, UCMJ, although also properly before us, imposes a higher burden for Appellant to demonstrate his entitlement to relief, and thus adds nothing of substantial benefit to Appellant in our analysis of these errors.

Accordingly, we deny Appellant's petition for a new trial.

**E. Post-Trial Delay**

### 1. Additional Background

Appellant was sentenced on 6 September 2017. The initial SJAR to the convening authority was signed on 12 October 2017, and served on Appellant and trial defense counsel five days later, on 17 October 2017. On 26 October 2017, trial defense counsel requested a post-trial Article 39(a) hearing to address the non-disclosure of Dr. DT's decertification by the AFDTL, as described above. Appellant submitted his initial clemency request on 15 November 2017, and the acting SJA signed the first Addendum to the SJAR on 19 November 2017.[14] On 20 November 2017, the convening authority ordered the Article 39(a) hearing which was held on 19 December 2017. On 5 February 2018 the military

---

[13] *See Fraud*, BLACK'S LAW DICTIONARY (6th ed. 1990) ("An intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right.").

[14] The SJAR and first Addendum were signed by Capt AW as acting SJA.

judge made his written findings and denial of Appellant's request for a new trial.

The acting SJA signed a second Addendum to the SJAR on 22 February 2018 addressing, *inter alia*, the results of the Article 39(a) hearing and the military judge's findings and ruling. On 1 March 2018, the Defense responded with a second clemency submission, raising *inter alia* the Government's failure to disclose the urinalysis reinspection policy, as described above. On 12 March 2018, the acting SJA signed the third and final Addendum to the SJAR.[15] The convening authority took action on 14 March 2018, 189 days after Appellant was sentenced.

Appellant's case was initially docketed with this court on 28 March 2018. Appellant filed his initial assignments of error as well as his petition for new trial on 24 October 2018. The Government filed its answer on 26 November 2018. On 12 April 2019, this court ordered a *DuBay* hearing, which was held on 30 May 2019. The military judge made his written findings on 2 July 2019. Appellant submitted supplemental post-*DuBay* hearing assignments of error on 6 August 2019, the Government answered on 9 September 2019, and Appellant replied to the Government's answer on 16 September 2019. Thus, this opinion was issued 18 months and 13 days after Appellant's case was initially docketed with this court.

**2. Law**

In *United States v. Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of trial, when a record of trial is not docketed with the court of criminal appeals within 30 days of the convening authority's action, and when the court of criminal appeals does not render a decision within 18 months of the case being docketed. 63 M.J. 129, 142 (C.A.A.F. 2006). Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the

---

[15] The second and third Addenda to the SJAR were signed by Maj BR as acting SJA.

public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

### 3. Analysis

Although Appellant does not raise post-trial delay as an error, he notes the 189 days that elapsed between the announcement of sentence and the convening authority's action exceeded by 69 days the 120-day standard for a presumptively unreasonable post-trial delay. *See Moreno*, 63 M.J. at 142. In addition, we note that over 18 months elapsed between the initial docketing of Appellant's case with this court and the issuance of this opinion, which is also a presumptively unreasonable delay. *See id.* Therefore, we have considered the four *Barker* factors to determine whether Appellant's due process right to timely post-trial and appellate review has been violated in this case. We find it has not.

In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted). In this case, we find no oppressive incarceration because Appellant's 30-day sentence to confinement expired long before the 120-day *Moreno* threshold for unreasonable post-trial delay was reached. Nor do we discern any impairment of Appellant's ability to present a defense at a rehearing. We do not authorize a rehearing as to the set-aside language of Specification 1 of the Charge, and therefore there will be no retrial on the merits. In addition, Appellant raises no potential impairment as to a sentencing rehearing arising from the delay, and we perceive none.

As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* at 140. Appellant has asserted no such particularized concern. Furthermore, at both the post-trial and appellate stages, the convening authority and this court actively responded to concerns raised by the Defense by directing post-trial hearings to address the Government's discovery failures. Thus, Appellant was not in the position of merely awaiting action by reviewing authorities with little sense that any progress was being made to address the issues he raised. On the contrary, Appellant personally attended post-trial hearings to thoroughly examine those issues. In that sense, Appellant may have experienced less than the "normal anxiety" of those simply "awaiting an appellate decision." *See id.*

Where, as here, there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the

public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362. We do not find such an egregious delay here. At both the post-trial and appellate stages, the additional delay was largely due to post-trial hearings to ensure the discovery issues Appellant raised were addressed. Although government discovery violations necessitated such proceedings, we find the fact that reviewing authorities directed further proceedings to ensure assignments of error raised by Appellant were thoroughly addressed tends to reflect positively rather than negatively on the "fairness and integrity" of the military justice system. *See id.* Accordingly, we find no violation of Appellant's due process rights.

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

**F. Sentence Reassessment**

Because we have modified the findings of guilty of Specification 1 of the Charge, wrongful use of cocaine, by excepting and dismissing the words "on divers occasions," we consider whether we can reassess the sentence. We have broad discretion first to decide whether to reassess a sentence and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). To determine whether to reassess a sentence or to order a rehearing, we consider the totality of the circumstances, including the following illustrative, non-exhaustive factors: (1) "Dramatic changes in the penalty landscape and exposure;" (2) "Whether an appellant chose sentencing by members or a military judge alone;" (3) "Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Id.* at 15–16 (citations omitted). However, in order to approve a reassessed sentence, we must "determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity." *Id.* at 15 (quoting *United States v. Moffeit*, 63 M.J. 40, 41 (C.A.A.F. 2006)).

In this case, we find a rehearing on the sentence to be appropriate. Although our modification to the findings does not alter the number of specifications of which Appellant was convicted or the maximum punishment to which

he could be sentenced, it does significantly alter the factual basis for his punishment. The remaining use of cocaine and the use of MDMA for which Appellant remains convicted occurred on the same night at an off-base party at which Appellant became highly intoxicated. Early the following morning, Appellant provided a urine sample pursuant to a unit drug sweep. Although the record is not clear at what point Appellant was informed of the MDMA use that he did not remember, at the time he provided his 18 February 2017 urine sample he knew at a minimum that he had wrongfully ingested cocaine. In that light, evidence of Appellant's subsequent decision to wrongfully use cocaine—the finding that we have set aside—transforms what might have been characterized as a one-time incident into a pattern of drug abuse, regardless of consequences, with significant potential negative impacts on the Defense's sentencing case. Yet Appellant remains convicted of substantial offenses. Because we cannot determine to our satisfaction that Appellant's sentence would have been of at least a certain severity that is also proportionate to the remaining offenses, we find it appropriate to authorize a rehearing on the sentence.

### III. CONCLUSION

The Petition for New Trial dated 24 October 2018, Misc. Dkt. No. 2018–09, is **DENIED**.

The finding of guilty with regard to Specification 1 of the Charge is modified as follows: the words "on divers occasions" are excepted, and the words "prior to the 54th Aircraft Maintenance Squadron's urinalysis inspection on 18 February 2017" are substituted therefor. The excepted words are **SET ASIDE** and **DISMISSED WITH PREJUDICE**.

The sentence is **SET ASIDE**. The case is returned to The Judge Advocate General for further processing consistent with this opinion. A rehearing on sentence is authorized. Article 66(e), UCMJ, 10 U.S.C. § 866(e).

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

23